UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MELODY DANIEL, )<br><br>    Plaintiff, )<br><br>  v. )<br><br>JO ANNE B. BARNHART,<br>Commissioner of the Social<br>Security Administration, )<br><br>    Defendant. ) | CASE NO. 1:04-cv-2089-DFH-WTL |

ENTRY ON JUDICIAL REVIEW

Plaintiff Melody Daniel seeks judicial review of a decision by the Commissioner of Social Security denying her application for disability insurance benefits under the Social Security Act. Acting for the Commissioner, an Administrative Law Judge ("ALJ") found that Ms. Daniel was not disabled within the meaning of the Act because she retained the residual functional capacity to perform her past work as an encoder. Ms. Daniel claims that the ALJ failed to consider a line of evidence regarding her complaints of leg swelling and cervical spine motion, failed to consider appropriately the opinion of a non-examining physician, and rendered a credibility finding that was patently wrong. As explained below, the case must be remanded because it is not supported by substantial evidence in the record.

*Background*

Plaintiff Melody Daniel was 51 years old and had a tenth grade education when the ALJ found her ineligible for disability benefits on June 18, 2002.  R. 42.  Ms. Daniel has worked as an assistant manager of a store, a cashier, and an encoder at a bank.  R. 348.  She claimed to suffer from left shoulder and arm pain, numbness in her left hand and fingers, a hiatal hernia, acid reflux, esophageal strictures, ulcers, left leg weakness, low back pain, and headaches.  R. 157, 169, 175.  She also testified before the ALJ that she had ulceration and severe swelling in her legs due to collapsed veins.  R. 72.  Ms. Daniel claimed that she had been disabled since April 20, 1997.  R. 150.

Ms. Daniel underwent neck surgery on May 17, 1995 after being diagnosed with cervical spondylosis.  R. 235, 237.  After the procedure, Malcolm Snell, M.D., noted that Ms. Daniel had "a good long-term prognosis."  R. 236.  On April 21, 1997, Ms. Daniel sought treatment with James A. Sabens, M.D., for pain in her left shoulder and arm.  Dr. Sabens noted a "probable left C-6 cervical root inflammation" and prescribed pain medication.  R. 254.  Ms. Daniel returned to Dr. Sabens complaining of pain several times in April and May 1997.  Dr. Sabens noted that she had a "pretty normal return of strength" in her left arm and he ordered that Ms. Daniel undergo a CT scan and a magnetic resonance imaging exam ("MRI").  R. 252.  He noted that it was not safe for Ms. Daniel to work or drive because of her pain and her medications.  R. 251-53.

Bruce Richmond, M.D., conducted an MRI of Ms. Daniel's cervical spine in May 1997. He noted an impression of mild degenerative disc disease changes associated with minimal spondylosis at the C4-5 level, as well as mild to moderate spondylosis and some narrowing of the left C6 neural foramen by a bony encroachment. He also noted mild to moderate degenerative disc disease change associated with mild to moderate spondylosis at the C6-7 level with a prominent focal spur. R. 232.

In June 1997, David Steiman, M.D., reported that Ms. Daniel exhibited some weakness in her left arm and noted that she was "getting worse and having more pain." R. 222. She underwent another neck surgery in June 1997. R. 257-60. In August 1997, Dr. Steiman wrote Dr. Sabens stating that Ms. Daniel had experienced some pain relief. He opined that Ms. Daniel could not yet return to even "light duty" work, but recommended that she undergo a "work hardening program" to allow her to return to employment. R. 220. In September 1997, Dr. Steiman noted that since Ms. Daniel had begun the work hardening program she was slightly better. R. 219.

A subsequent MRI report by James Boganno, M.D., in September 1997 showed "post anterior cervical fusion changes at C5-6 and C6-7" and resolution of the spur. Dr. Boganno also noted some edema of the C6 root on the left, which he interpreted as suggesting radiculitis but not structural impingement of the C6 or C7 roots. R. 230. Dr. Steiman wrote to Dr. Sabens that the MRI results were

"quite good."  R. 218.  He later informed Dr. Sabens that Ms. Daniel should not return to work but should be "on long-term disability."  R. 216.

Daniel Cooper, M.D., performed an independent medical evaluation of Ms. Daniel in September 1997.  Dr. Cooper observed that Ms. Daniel, who weighed 230 pounds and was five feet three inches tall, moved about "fairly slowly."  R. 262.  Dr. Cooper wrote that Ms. Daniel had discomfort with left shoulder motion but had a full range of motion.  Dr. Cooper noted nondermatomal hypalgesia in Ms. Daniel's left arm and some hypersensitivity to touch in the suprascapular area.  He wrote that the September 1997 MRI showed that the area of the anterior cervical disc and fusion at C5-6 and C6-7 appeared significantly better and that he saw no major compression, bloom, or osteophytic significant spurs.  He observed that her anterior cervical disc and fusion appeared to have decompressed the nerve root.  Dr. Cooper recommended that Ms. Daniel not return to work because "of her inability to sit for any length of time, her limitation of motion of the neck and the arm, and the weakness in her left side."  R. 262-63.  Dr. Cooper opined that Ms. Daniel would not benefit from physical therapy, but he recommended a structured pain program and consultation with a psychiatrist.  R. 261-63.

A November 7, 1997 field report of an interview with Ms. Daniel states that the interviewer observed that she had difficulty sitting, standing, walking, and using her hands.  R. 166.  Consultative reviewer Rose Fife, M.D., completed a

physical residual functional capacity assessment ("RFC") of Ms. Daniel on November 22, 1997. The RFC stated that Ms. Daniel was limited to occasionally lifting no more than 20 pounds and frequently lifting no more than 10 pounds. It stated that Ms. Daniel was capable of sitting and standing for six hours each in an eight-hour workday, was limited in her ability to push, pull, or reach in all directions with her left arm, could occasionally crawl, and could never climb a ladder, rope, or scaffold. Dr. Fife opined that Ms. Daniel should avoid concentrated exposure to extreme temperatures or wetness, vibration, and hazards such as machinery or heights. R. 273-80.

In January 1998, Dr. Steiman wrote to inform Dr. Sabens that Ms. Daniel had a "totally normal" left arm electromyogram and nerve conduction study. He advised that she be referred to a pain center "because there [was] no evidence of any ongoing denervation or any ongoing problem with her nerves." R. 331.

Ms. Daniel sought treatment for chronic left arm and shoulder pain with Marc A. Darst, M.D., in June and September 1998. Dr. Darst noted that it was unlikely that Ms. Daniel would be able to go back to work. He prescribed pain medication and referred her to a pain clinic. R. 332-33.

Dr. Cooper saw Ms. Daniel for an additional evaluation in November 1998. He wrote that she complained of pain in her neck and shoulder, tingling and numbness in the fingers of her left hand, and weakness in her left arm and leg.

He noted that Ms. Daniel took Vicodin regularly to relieve her pain, she could not sleep for more than three to four hours at a time, and her symptoms were not responsive to pain management attempts.  R. 362.

Dr. Cooper wrote that Ms. Daniel had restricted left shoulder motion, left shoulder pain, and weakness in her left arm and hand.  He observed that she exhibited a normal gait and station, showed a normal range of back motion, and could walk heel to toe.  A sensory examination showed Ms. Daniel experienced nondermatomal hypalgesia involving the entire left side of her body and some hypersensitivity in her left shoulder.  Dr. Cooper's review of Ms. Daniel's MRI showed no recurrent disc herniation and "some question of edema of the C6 nerve root on the left."  R. 363.  Dr. Cooper opined that Ms. Daniel could not perform any type of work and was not reasonably suited for education training.  He wrote that she could not sit for any length of time because of discomfort and had only minimal and painful use of her left shoulder, arm, and hand.  He also noted that she was taking "considerable" pain medication and that her condition was unlikely to improve significantly.  *Id.*

After Ms. Daniel's claim for disability benefits was denied both initially and upon reconsideration, she requested a hearing before an ALJ.  ALJ James R. Norris held a hearing in this matter on January 25, 1999 at which both Ms. Daniel and vocational expert Ray Burger testified.  Ms. Daniel testified that she had worked at her job as an encoder at a bank almost twelve years before she

stopped working in April 1997 because of back pain.  Ms. Daniel testified that her encoding job required her to sit and run a machine for approximately six hours, to periodically stand and walk for a total of approximately two hours, to bundle checks, and to regularly lift no more than three pounds.  R. 40-47.

When the ALJ inquired about Ms. Daniel's hobbies, she testified that she "did have hobbies," including flower arranging and other crafts, but had stopped "most of it" because of her symptoms.  Ms. Daniel testified that she spent most of the day watching television or lying down resting.  She testified that she did not walk long distances, that she did not drive more than once a month, and that she occasionally visited relatives or friends when her husband could drive her on the weekends.  R. 47-49.

Ms. Daniel testified that she had trouble sitting "for any length of time," could not walk "for any distance," and had a lot of pain.  She also testified that, although she was right-handed, the numbness in her left hand prevented her from performing the encoding job because the encoding machine required her to use both hands.  She testified that she suffered from constant pain that ran from the back of her neck down between her shoulder blades and through her left arm to her hand and fingers.  Ms. Daniel testified that she could not feel her fingers and could not hold anything weighty, like a full glass, with her left hand.  R. 49-53.

When questioned by her attorney, Ms. Daniel testified that she stopped floral arranging because of the numbness in her hand and pain from sitting. She also testified that she needed to lie down "a lot" each day as a result of her back pain, but that she got some pain relief from sitting and standing. R. 53.

The vocational expert testified that a hypothetical individual of Ms. Daniel's age, education, and work experience who was limited to light work not requiring frequent use of the non-dominant hand could perform work as a crossing guard, usher, or night watchman. The vocational expert also testified that the same person could not perform these three jobs, or any sedentary jobs, if she needed to alternate sitting and standing. He testified that light duty and sedentary work often required the use of both hands. R. 53-58.

The ALJ issued his decision that Ms. Daniel was not disabled within the meaning of the Act on February 23, 1999. R. 95. Ms. Daniel requested that the Appeals Council review the decision.

While her request was pending, Ms. Daniel continued to seek treatment for her symptoms relating to her back, left arm, and left hand from Dr. Darst and Dr. Rashid Khairi. See R. 364-414. In May 1999, Dr. Darst reported that Ms. Daniel had peripheral edema, noted that she had not been walking much, and recommended that she lose weight. R. 414. From 1999 until 2001, Ms. Daniel's

records show that she complained of, and her doctors observed, swelling in her legs.  R. 409-14, 364-77.

On July 27, 2001, the Appeals Council granted Ms. Daniel's request for review, vacated the ALJ's findings, and remanded the case for further proceedings. The Appeals Council noted that the ALJ's 1999 decision did not take into account the evaluation of examining and treating source opinions from Dr. Cooper and Dr. Darst.  The ALJ was instructed to consider these opinions and to remove an exhibit from the record that did not pertain to Ms. Daniel.  R. 137-38.

On April 9, 2002, Charles M. Platz, M.D., completed a "Physical Capacities Evaluation" for Ms. Daniel.  The evaluation stated that Ms. Daniel was capable of sitting for 15 minutes at a time, standing for 30 minutes at a time, and not capable of walking at all.  It also stated that Ms. Daniel was capable of sitting and standing each for two hours in an eight-hour work day.  The evaluation stated that Ms. Daniel could occasionally lift up to ten pounds and occasionally carry up to five pounds.  Dr. Platz evaluated Ms. Daniel as being unable to use her hands for repetitive simple grasping, repetitive pushing or pulling, or any repetitive fine manipulation.  The evaluation also stated that Ms. Daniel was unable to use either foot for any repetitive movements, such as pushing or pulling leg controls.  Dr. Platz noted that Ms. Daniel was unable to bend, squat, crawl, climb, or crouch. He also noted that she required total restriction of all activities involving

unprotected heights, moving machinery, exposure to marked changes in temperature and humidity, and any exposure to dust, fumes, or gases.  R. 457.

The ALJ held another hearing in the matter on May 20, 2002 at which Ms. Daniel, the vocational expert, and medical expert Dr. Richard Hutson testified. At the remand hearing, Ms. Daniel testified that since her testimony at the 1999 hearing, she had developed collapsed veins in her legs that caused ulcerations and severe swelling.  She testified that the swelling and ulcerations caused  severe leg cramps and made it difficult for her to sleep, sit, or walk.  She testified that she was receiving treatment using an air compressor machine and surgical hosiery. She also testified that she continued to experience severe back pain and that her condition had not improved since the 1999 hearing.  R. 68-72.

Dr. Hutson testified that Ms. Daniel had undergone two surgeries, one in 1997 and the other in 1995, and that her medical records showed evidence of degenerative disc disease in the cervical spine area with nerve root irritation but not nerve root compression.  R. 73, 79.  Dr. Hutson expressed concern at Dr. Platz's assessment, noting that there was no objective evidence supporting his functional capacity evaluation.  R. 75.  The ALJ asked Dr. Hutson about Ms. Daniel's new claims:

Q.   And what is your recommendation, Doctor?

A.   May I ask [Ms. Daniel] something first, Your Honor –

Q.   About her condition?

-10-

A.     – about this new circulation thing?

Q.     Well, is there, let's, let's, let's take this in the way we're supposed to take it.  Is there evidence in the record of the circulation problem?

A.     No.

Q.     Okay.  Well, then I'm going to have to tell you that unless there's evidence in there, then we're only evaluating symptoms and that's, to be real, real honest with you that's not why I have you as a Medical Expert here to evaluate symptoms, that's, that's my job.

A.     I understand.  Supposed to be objective evidence in the medical record.  I understand that, Your Honor.  Based upon the evidence of record, I believe that she could do light work, Your Honor.

*Id.* Dr. Hutson testified that he "essentially" agreed with Dr. Fife's recommended restrictions, including those limiting climbing, crawling, extreme temperatures, wetness, vibration, heights, and machinery.  He also testified that he agreed with Dr. Fife's recommended limitations on overhead reaching.  Dr. Hutson did not specifically mention Dr. Fife's recommendation as to a limitation on manipulation with the left hand.  R. 77-78.

After reading Dr. Cooper's November 1998 assessment, Dr. Hutson opined that Ms. Daniel was capable of performing a full range of sedentary work with a ten pound lifting limitation.  He testified that while Ms. Daniel had a condition that might reasonably cause pain, he did not know what was causing her pain. He doubted that her neck pain interfered with her ability to sit, explaining that sitting for long periods of time has no association with neck discomfort.  R. 81-84.

The vocational expert testified that Ms. Daniel's previous job as an encoder was sedentary semi-skilled work. R. 85. The ALJ asked the vocational expert if a hypothetical person of Ms. Daniel's age, education, and experience could continue to perform her past work if she (1) could occasionally lift ten pounds and frequently lift and carry less than ten pounds; (2) was able to sit, stand, and walk each for six hours in an eight-hour workday; (3) had restrictions as to climbing, crawling, exposure to temperature extremes, wetness, humidity, vibration, heights, or dangerous machinery; and (4) could not perform overhead work or work above the shoulder level. The ALJ did not incorporate a restriction on manipulation by the non-dominant hand into his hypothetical question. The vocational expert testified that an individual with these characteristics could perform Ms. Daniel's past work as an encoder, as well as work as a general office clerk, assembler, hand packager, night watchman, usher, and parking lot attendant, but could not perform those jobs or any other if she was unable to sit for any period of time. R. 86, 88-89.

When questioned by Ms. Daniel's attorney, the vocational expert testified that an individual with the limitations described by Dr. Platz or who could not use the right or left hand for simple grasping, pushing, pulling, or fine manipulation could not perform any jobs. R. 87.

The ALJ issued his finding that Ms. Daniel was not disabled on June 18, 2002. After that decision, the Appeals Council denied further review of the ALJ's

decision, R. 11, so the ALJ's decision is treated as the final decision of the Commissioner. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). Ms. Daniel has sought judicial review of the ALJ's decision in this court.

*The Disability Standard*

To be eligible for disability insurance benefits, a claimant must establish that she suffers from a disability within the meaning of the Social Security Act. To prove disability under the Act, the claimant must show that she was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d). Ms. Daniel was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her. *Id.*

This standard is a stringent one. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985). Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability.  The steps are:

(1)   Has the claimant engaged in substantial gainful activity? If so, she was not disabled.

(2)   If not, did the claimant have an impairment or combination of impairments that are severe?  If not, she was not disabled.

(3)   If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)   If not, could the claimant do her past relevant work? If so, she was not disabled.

(5)   If not, could the claimant perform other work given her residual functional capacity, age, education, and experience? If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

*Standard of Review*

If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v.*

*Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  Accordingly, the ALJ must explain the decision with "enough detail and clarity to permit meaningful appellate review."  *Briscoe*, 425 F.3d at 351.

*Discussion*

Applying the five-step evaluation process, the ALJ found that Ms. Daniel satisfied steps one and two:  she was not currently working and she had the severe impairment of "cervical spondylosis, post discectomies at the C5-6 and C6-7 levels."  R. 21.  He found that her other alleged impairments including obesity, hypertension, and digestive tract disorders were not severe impairments within the meaning of the Social Security Act.  He also found that Ms. Daniel did not

have "medically determinable, severe impairments" of ulceration or leg swelling. The ALJ found that Ms. Daniel did not satisfy steps three or four.  At step three, she failed to show that her impairments met or equaled a listed impairment.  At step four, the ALJ found that Ms. Daniel retained the residual functional capacity to perform her past occupation as an encoder.  The ALJ therefore found that she was not disabled under the Act without reaching step five.  R. 29.

Ms. Daniel challenges the ALJ's finding that she retained the capacity to perform her previous work as an encoder.  She argues that the ALJ's findings were not based on substantial evidence because the ALJ (1) omitted or ignored substantial evidence of swelling in her legs; (2) failed to evaluate adequately Dr. Fife's recommended restriction on repetitive movements with her left arm; (3) underestimated her limitations in her cervical spine motion; and (4) made errors rendering his credibility finding patently wrong.  Because the ALJ rendered an adverse credibility finding that was insufficient to be upheld and committed other errors that render his opinion unsupported by substantial evidence, his decision must be remanded for further consideration.

I.   *Credibility*

Ms. Daniel challenges the ALJ's adverse credibility finding that she was not a fully credible witness with respect to her complaints of pain, other symptoms, and functional limitations.  R. 29.  Because the ALJ's finding is patently wrong and is not supported by substantial evidence, it cannot be upheld.

Because hearing officers have the unique opportunity to observe a witness and to evaluate a witness's forthrightness, courts ordinarily afford such officers' credibility determinations substantial deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  An ALJ's credibility finding will not be disturbed unless it is "patently wrong."  *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986); see also *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).  However, where the ALJ bases his finding on "objective factors or fundamental implausibilities, rather than subjective considerations," such as an employee's demeanor, the court enjoys greater freedom to review the finding.  *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  An ALJ's decision will not be upheld where the ALJ failed to "build an accurate and logical bridge" between the evidence in the record and the findings.  *Sarchet*, 78 F.3d at 307.

Ms. Daniel complained of pain, numbness, and weakness that prevented her from using her left arm.  She testified that she experienced numbness in the fingers of her left hand, that she could not hold objects with any weight in that hand, and that these symptoms prevented her from being able to work the encoding machine at her former job.  Ms. Daniel also testified that she continued to experience severe pain and that her back condition had not improved at all.  R. 72.  The ALJ omitted the inability to use her non-dominant hand in the hypothetical question he posed to the vocational expert.  The vocational expert testified that if the individual in the ALJ's hypothetical question could not use a

non-dominant hand for grasping, pushing, pulling, or fine manipulation, that person could not perform any jobs.  See R. 86, 87.

The ALJ based his credibility finding on what he determined to be inconsistencies between Ms. Daniel's claims and the other evidence in the record, namely the medical evidence of her nondermatomal hypalgesia and the evidence of her hobbies and daily activities.

The first reason provided by the ALJ for discrediting Ms. Daniel's testimony was a lack of objective medical evidence in the record supporting her claims of numbness and hypalgesia in her left arm.  The ALJ cited evidence that these symptoms did not follow dermatomal patterns and a that an electromyogram and nerve conduction velocity study showed normal results.  R. 27, citing R. 262, 331. The ALJ can discount subjective complaints that are inconsistent with the evidence as a whole, but cannot discount such complaints merely because they are not supported by objective medical evidence.  *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995), citing 20 C.F.R. § 404.1529(c)(3) ("The absence of objective medical evidence is just one factor to be considered along with:  (a) the claimant's daily activities; (b) the location, duration, frequency and intensity of pain; (c) precipitating and aggravating factors; (d) type, dosage, effectiveness and side effects of medication; (e) treatment other than medication; (f) any measures the claimant has used to relieve the pain or other symptoms; and, (g) functional limitations and restrictions.").

The ALJ also stated that Ms. Daniel's complaints that she was unable to use her left arm because of pain and numbness were inconsistent with her daily activities, which included cooking and cleaning her house.  The ALJ cited Dr. Darst's notes from April 1999 stating that Ms. Daniel experienced hot flashes when exercising "a little" or "running a sweeper." R. 27, citing R. 416.  In January 1998, Ms. Daniel wrote in her reconsideration report that her pain had increased and that it was difficult for her to cook or to do laundry or housework.  R. 169, 171.  She also testified that she had trouble sitting "for any length of time" and could not "walk for any distance." R. 49.  She testified that she experienced great pain that was made worse by reaching, sitting, standing, or walking, and that she was unable to hold an object with any weight, such as a full drinking glass, in her left hand because of her numbness.  R. 51.  Ms. Daniel testified at her 1999 hearing that during the day she often did "some light housework" and tried to fix at least one meal per day for her husband and son.  R. 47.  She testified that apart from these activities, she spent most of her day lying down resting or watching television.  She also testified that the only walking she did was around her house, that she did not drive more than once a month, and that she occasionally visited relatives or friends on the weekends when her husband could drive her.  R. 47-49.

The ALJ is entitled to discount evidence that is internally inconsistent or inconsistent with other evidence in the record.  20 C.F.R. § 404.1527(c)(2); *Luna*, 22 F.3d at 690-91; SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other

information in the case record."). The ALJ failed to explain, however, why Ms. Daniel's reports of minimal daily activities were inconsistent with her claim that she could not work. Without further explanation of the inconsistency cited by the ALJ, the court fails to see how this evidence demonstrates that Ms. Daniel was capable of engaging in substantial gainful activity eight hours per day five days per week. See, e.g., *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (reversing and remanding ALJ's finding of non-disability; adverse credibility finding could not stand where ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days a week."); *Zurawski*, 245 F.3d at 887 (adverse credibility determination was insufficient where ALJ failed to explain how the claimant's minimal daily activities, which included washing dishes, helping his children get ready for school, doing laundry, and preparing dinner, were inconsistent with his complaints of disabling pain); *Clifford*, 227 F.3d at 872 (claimant's activities, including grocery shopping three times per month, cooking simple meals, vacuuming with discomfort, playing cards, and walking for exercise insufficient to support ALJ's adverse credibility finding).

The ALJ also cited as a basis for his credibility finding what he characterized as an additional inconsistency regarding Ms. Daniel's hobbies: "Although she initially testified in January of 1999 that she enjoyed doing crafts and making floral arrangements, she later corrected herself and said she had been forced to give up flower arranging because of her inability to use her left arm." R.

27.  When initially asked if she had hobbies, however, Ms. Daniel answered that she "did have hobbies" but had stopped "most of that" because of her symptoms. R. 48.  When her attorney questioned her about her hobbies, she testified consistently with her earlier statements that she no longer engaged in flower arranging.  R. 53.  The ALJ's characterization of Ms. Daniel's testimony regarding flower arranging as inconsistent misstates the evidence.

In addition to the errors and omissions already discussed, the ALJ failed to recognize in his credibility finding that the long history of Ms. Daniel's treatment supported her allegations of disabling pain.  The Seventh Circuit encountered similar circumstances in reversing and remanding the ALJ's credibility determination in *Carradine*, 360 F.3d at 755.  In *Carradine*, the Seventh Circuit found an ALJ's adverse credibility finding was patently wrong, in part because he failed to recognize that the claimant's long history of serious pain treatment, including prescriptions for strong medications like Vicodin and extensive pain-treatment procedures, including the implantation of a catheter and a spinal cord stimulator, supported her claims of disabling pain.  *Id.* at 754.  The court found this omission significant because of the unlikelihood that either (1) the plaintiff would go to such great lengths if she did not experience severe pain; or (2) physicians and other health professionals who had treated her were consistently fooled by her or were conspiring with her by prescribing her medications for false pain.  *Id.* at 755.

-21-

Similarly, Ms. Daniel also has a long record of treatment for her consistent complaints of pain and numbness.  The record demonstrates that in an effort to alleviate this pain, Ms. Daniel underwent two neck surgeries and was prescribed Vicodin, R. 332, the Duragesic pain patch, R. 442, Hydromorphone, R. 452, Vioxx, R. 410, methadone, R. 439, and Oxycontin.   R. 456, 448, 442, 438, 430.  Additionally, there is evidence that Ms. Daniel underwent physical therapy, nerve injections, nerve blocks, and cervical traction.  R. 254, 362, 420.  In light of the ALJ's failure to recognize how Ms. Daniel's extensive medical record of intense pain treatment supported her claims of disability, and in light of the other errors and omissions in the ALJ's credibility determination, the court finds that the ALJ's credibility finding is not supported by substantial evidence.

II.   *Additional Errors and Omissions*

Also weighing in favor of remand are additional errors or omissions by the ALJ regarding evidence of Ms.Daniel's leg swelling and impairment in her cervical spine motion.

Ms. Daniel had two cervical spine surgeries, one in May 1995, R. 237, and another in June 1997.  R. 257-60.  Ms. Daniel submitted evidence from several doctors observing that she had limited or painful cervical spine motion following her surgeries.  In May 1998, Joe Grady, M.D., noted that Ms. Daniel had reduced cervical spine motion.  He noted that her right lateral flexion was limited to 35 degrees, with 45 degrees being normal.  He also noted that her cervical spine

rotation, which would have been normal at 80 degrees, was limited to 65 degrees on the right and 45 degrees on the left.  R. 326.  In November 1998, Dr. Cooper completed a Neurosurgical Consultation report stating that Ms. Daniel had "marked restriction of neck motion" and that "any movement seem[ed] to aggravate her symptomology." R. 362.  On August 16, 1999, J. Theodore Luros, M.D., reported that Ms. Daniel experienced pain and limitation of neck movement. R. 421.  On August 17, 2000, Dr. Khairi noted that Ms. Daniel had "tenderness in movement of her cervical spine."  R. 377.

Dr. Fife recommended that Ms. Daniel not work at dangerous heights or around dangerous machinery.  R. 273-80.  Dr. Hutson testified that he agreed with this assessment, based on Ms. Daniel's limited ability to turn her head.  R. 78.  The ALJ accorded Dr. Hutson's opinion greater weight than those of the treating, examining, or other consulting physicians.  R. 25.

Although the ALJ referenced Ms. Daniel's cervical spine motion, R. 24-26, he did not include in his residual functional capacity finding a limitation on cervical spine motion, and he did not provide any reason for rejecting this limitation.  Even Dr. Hutson, whose opinion the ALJ gave the most weight, testified that he agreed that Ms. Daniel had problems with turning her head.  The omission of a finding regarding cervical spine motion from the ALJ's residual functional capacity assessment amounts to error in this case.

Additionally, Ms. Daniel testified that she suffered from collapsed veins in her legs that caused severe leg swelling.  She also testified that the swelling interfered with her ability to sit, walk, and sleep.  She testified that she was undergoing treatment using surgical hosiery and an air compressor machine.  R. 72.  After Ms. Daniel testified, the ALJ consulted Dr. Hutson.  When asked whether there was evidence in the record of the new "circulation problem" of which Ms. Daniel complained, Dr. Hutson testified that there was not.  R. 75. Finding that neither the ulcerations nor the leg swelling amounted to a medically determinable severe impairment, the ALJ supported this assertion by citing Dr. Hutson's testimony alone.  R. 21.

There was significant evidence, however, of leg swelling in Ms. Daniel's medical records.  This evidence referenced circulatory problems as well as sodium excess as related to the swelling.  Dr. Khairi and Dr. Darst each consistently noted or observed Ms. Daniel's problems with leg swelling from May 1999 through September 2001.  R. 367, 368, 371, 374, 375, 377, 410, 412, 413, 414.  Dr. Khairi noted that Ms. Daniel's edema was related to her sodium intake in her diet, recommended that she reduce her salt intake, and Dr. Darst noted that Ms. Daniel's edema improved with decreased sodium intake.  R. 372, 373, 375.

There was evidence that Ms. Daniel's leg edema was worsening with time. In January 2000, Dr. Darst noted that Ms. Daniel's leg edema had increased recently, that she had a history of deep vein thrombosis, and that the Lasix Ms.

Daniel was being prescribed was not controlling the edema "as well as it could be." R. 411.  In June 2001, Dr. Khairi noted that Ms. Daniel's leg edema "seems to be getting worse," and that Ms. Daniel would begin to use a compression machine on her legs at night to help her with her "veinous insufficiency."  Dr. Khairi noted that the machine had helped Ms. Daniel with her edema while she was in the hospital.  R. 366.  In July 2001, Dr. Khairi noted that Ms. Daniel experienced swelling and leg cramps.  He wrote that her insurance company would not pay for machine-regulated leg pressure at home and that Ms. Daniel reported that surgical hose did not alleviate the problem, so he wanted to rule out polycythemia. R. 365.  By September 2001, Dr. Khairi noted "marked swelling" in Ms. Daniel's lower extremity and noted that leg edema was causing her "considerable" problems.  R. 364.

Whether Ms. Daniel's leg edema amounts to a severe impairment is not for the court to say.  That is for the ALJ to determine after a proper review of the full record.  The ALJ's finding that Ms. Daniel's leg swelling did not amount to a medically determinable severe impairment, however, ignored consistent objective medical evidence in the record of Ms. Daniel's leg swelling.  Although the ALJ is not required to discuss every piece of evidence in the record, he may not ignore an entire line of evidence contrary to his opinion, because doing so prevents a reviewing court from knowing whether the ALJ's decision is supported by substantial evidence.  *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).  While the ALJ cited Dr. Hutson's testimony at the 2002 hearing that there

was no evidence of Ms. Daniel's newly reported leg swelling problem in the record, the record shows otherwise.  The court therefore cannot be confident that the ALJ considered the evidence of Ms. Daniel's leg swelling.  In failing to acknowledge the significant and repeated objective medical evidence of Ms. Daniel's leg swelling, observed by two treating physicians, the ALJ improperly ignored an entire line of evidence contrary to his opinion.

The court recognizes that on remand the record might still support a finding that Ms. Daniel is not disabled.  Even where the record contains sufficient evidence to support an ALJ's decision, however, the decision may not be upheld where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Sarchet*, 78 F.3d at 307 (7th Cir. 1996); accord, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).   The cumulative effect of the ALJ's mistakes and omissions, combined with the ALJ's errors in his credibility finding, warrant remand in this case because the ALJ failed to build the necessary logical bridge between the evidence and his findings.

*Conclusion*

For the foregoing reasons, the decision of the ALJ is reversed and remanded for reconsideration consistent with this entry.  On remand, all steps of the five-step sequential evaluation are subject to reconsideration.  Final judgment shall be entered consistent with this entry.

So ordered.

Date: March 30, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

J. Frank Hanley, II
lawoffices@jfrankhanley.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov